UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAM HAIGH,<br><br>        *Plaintiff,*<br>v.<br><br>REED CHOJNACKI, et al.,<br><br>        *Defendant.* | 16-cv-00854 (PGS)(DEA)<br><br>**MEMORANDUM** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendant Reed Chojnacki's motion for summary judgment (ECF No. 34), Defendants Alec Hirsch and Todd Hirsch's motion for summary judgment, (ECF No. 33), and Defendant Andrew V. Hollander's motion for summary judgment (ECF No. 36).[1] This case arises from an alleged arson of Plaintiff Sam Haigh's boat, the Fiddler ("the Fiddler" or "Vessel"). (Hollander Statement of Facts (SOF), ECF No. 36-1 at ¶ 1). Plaintiff brought the present suit against Defendants Andrew V. Hollander, Reed Chojnacki, Alec Hirsch, and Samantha Cooper, all teenagers at the time of the alleged arson, and each teenagers' respective parents or legal guardians. For the reasons set forth below, including the conflicting testimony of the four teenagers, summary judgment will be granted in part and denied in part.

I

Andrew, Reed, and Samantha[2] were friends from Red Bank High School, and Alec was Andrew's friend from Marlboro, New Jersey. On January 31, 2014, Andrew, Reed, Alec, and

---

[1] Each Defendant moved to address the measure of damages; however, the Court declines to decide that issue at this time.
[2] Defendant Samantha Cooper was dismissed from this action on January 10, 2019. (ECF No. 50).

1

Samantha went to the Dunkin Donuts in Red Bank, New Jersey. (*Id.* at ¶ 3. Thereafter, the teenagers walked over to the Navesink River. Since the Navesink was frozen, they entered onto the ice and headed towards the Fiddler, which was moored offshore.[3] (*Id.* at ¶ 4). Alec and Reed boarded the Vessel. (Chojnacki Dep., ECF No. 34-3, T22-24). Alec and Reed removed a flare gun, flares, night vision goggles, and binoculars from the Fiddler. (Hirsch SOF, ECF No, 33-1, at ¶ 12). The teenagers divided up the equipment, but either Alec or Andrew kept the flare gun and flares. (Supp. Investigation Report, ECF No. 33-3 at 66).

Approximately two weeks after the January theft, on February 12, 2014, the New Jersey State Police received a report that the Vessel was afire on the Navesink River.[4] (*Id.* at 58). According to the police report, the fire consumed most of the Vessel, and there was "nothing suspicious observed at the scene." (*Id.*) There were no witnesses. (*Id.*) Further, a member of the Monmouth Boat Club informed the State Police that the Vessel was subject to a previous act of vandalism two weeks earlier, and it appeared that a rescue flare was shot into the side of the boat, igniting a small fire. (*Id.*)

A short time later, Plaintiff allegedly received an anonymous letter that named certain individuals who attended Red Bank High School, and who were allegedly involved in the burning and sinking of the Fiddler. (Haigh SOF, ECF No. 38, at ¶ 3). Plaintiff learned that the individuals named in the letter were known to his children and their friend, Kobe Miller. Plaintiff asked Miller to "keep his eyes and ears open for clues about who may have destroyed the Fiddler." (*Id.* at ¶ 5). Miller then provided Plaintiff with a printed copy of a Facebook chat he had with Andrew on

---

[3] Defendants allege that the Vessel appeared to be abandoned on the Navesink, because there appeared to be no windows or lights, and all the glass on the vessel was broken. (Chojnaki SOF, ECF No. 34-3, at ¶ 8).
[4] The parties have not raised any issues concerning the admissibility of the police report.

2

February 25, 2014, wherein Andrew acknowledged that he was present when the Vessel was set on fire, and he identified the individual who lit the fire as "his friend from Marlboro":

> Miller: Hey did you hear about the boat that was destroyed on [N]avesink?
>
> Andrew: maybe... I know who did it ... I was there[.]
>
> Kobe Miller: What happened.
>
> Andrew: Me[,] [R]eed[,] my friend[,] and Sam were there and we robbed the boat (well my friend and [R]eed[,] I stayed on the ice with Sam) [R]eed found night vision goggles and my friend found the flare guns and flares and when Sam and [R]eed went home me and my friend went back out on the ice and he was drunk . . . and light the flares and left them on the boat then from a distance my friend shot the flare gun at the boat 3 times and on the 3rd one it blew it up . . . [Sam and Reed] weren't there when that happened though just when it was robbed by pirates . . . Pirates = my friend and [R]eed[.]

(Facebook Chat, ECF No. 33-3, at Ex. F).

Despite this admission, Andrew subsequently denied any involvement with the fire, and instead alleges that he did not learn of the fire until Reed showed him a news story about the arson. At his deposition, Andrew recanted and admitted that he lied when he blamed the fire on "his friend from Marlboro," Alec. (*See* Hollander dep., ECF No. 33-4, at T35:1-12T35:25 to T36:8; T43:15 to T45:12). He explained that he told Miller he was there during the fire because "the kid I was talking to was a popular kid and for someone like me that, you know, was just an average person that's just going through high school it was nice when a popular kid acknowledged he wanted help or wanted anything from me." (Hollander dep., ECF No. 33-4, at T35:1-12).

Alec alleges that he was not involved with the fire, but instead first learned of it via a Facebook chat with Andrew, who linked in a newspaper article concerning the fire. (*See* Hirsch dep., ECF No 33-3, at Ex. B, T48:6-18; Facebook Chat ECF No. 33-3, Ex. E). Alec asked Andrew,

3

"that was you?!" and Andrew responded: "nope . . . I know who it was . . . [there was a] gas leak and he [lit] it on fire and booked it." (*See* Hirsch dep., ECF No 33-3, at Ex. B, T48:6-18; Facebook Chat ECF No. 33-3, Ex. E).

Reed denies any involvement with the boat fire, and instead alleges that he first learned of the fire at school through defendants Andrew and Samantha. (Chojnacki dep., ECF No. 34-4, at T41:1-21 to 42:1). Samantha also stated that around this time, Andrew was "walking around joking about lighting the boat on fire." (Cooper Dep., at T25:16-24). Samantha noted that Andrew said, "Guess what I did . . . I burn[ed] the boat down." (*Id.* at T26:15-17).

On March 10, 2014, Reed was interviewed by the State Police, and he admitted to boarding the Vessel on January 31, 2014, and taking the binoculars. (Supp. Investigation Report, ECF No. 36-9 at 8). He also told the State Police that Andrew was a "pyro" and likes to play with lasers and fire. (*Id.* at 9). On March 11, 2014, Alec was questioned by the police, admitted to boarding the Vessel on January 31, 2014, and taking the flares. (Supp. Investigation Report at 10). He also admitted to attempting to light flares with Andrew at Andrew's home. (*Id.*) Alec confirmed that he was still in possession of the flare gun taken from the Vessel. (*Id.*) At the conclusion of the interview, Alec informed the State Trooper that Andrew "likes to play with fire." (*Id.*) That same day, Alec's father returned the flare gun and flares to the State Police. (Hirsch SOF, ECF No. 33-1, at ¶ 21). According to Alec's father, he saw no evidence that the flare gun had been used. (*Id.* at ¶ 22). In November 2014, the minor Defendants were each charged with Juvenile Delinquency for conspiracy to commit burglary and conspiracy to commit theft over $500, but no prosecution was undertaken. (Supp. Investigation Report, at 16).

Plaintiff's complaint sets forth the following claims: (1) Negligent Damage to Vessel against the minor defendants (Counts I, V, IX, and XIII); (2) Tort and Conspiracy against the minor

4

defendants (Counts II, VI, X, and XIV); (3) Invasion by Andrew, Alec, and Reed (Counts III, VII, and XI); (4) Parental tort of negligent supervision against the minor defendants' parents or legal guardians (Counts IV, VIII, XII, and XV). Defendants each move for summary judgment, arguing that there is no evidence in the record that supports that they had any involvement with the boat fire, that there are no viable claims for negligent supervision, and Plaintiff's damages should be limited to diminution of value.

II

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings

are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of the non-moving party, and making all credibility determinations in his favor that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

## III

1. Negligent Damage to Vessel (Counts I, V, and IX)

Under general federal maritime law, "negligence is an actionable wrong." *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003). Negligence in admiralty law is "essentially coextensive with its common law counterpart. . . ." *Pogan v. M/V Venture Pride*, 2018 U.S. Dist. LEXIS 51875, at *5-6 (D.V.I. Mar. 28, 2018) (citing *In re Frescati Shipping Co.*, 718 F.3d 184, 207 (3d Cir. 2013)); *see also Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 815 (2001). Thus, to prevail on a maritime cause of action, plaintiffs must show there was "1) a duty of care which obliges the person to conform to a certain standard of conduct; 2) a breach of that duty; 3) a reasonably close causal connection between the offending conduct and the resulting injury; and 4) actual loss, injury, or damages suffered by the Plaintiff." *Galentine*, 273 F. Supp. 2d at 544 (citing 1 Thomas Schoenbaum, Admiralty and Maritime Law § 5-2 at 170 (3d ed. 2001)); *see also Sheeran v. Blyth Shipholdings S.A.*, No. 14-5482, (2017 U.S. Dist. LEXIS 44208, at *15 (D.N.J. Mar. 27, 2017).

Here, the "general maritime negligence standard" is "the duty of exercising reasonable care under the circumstances of each case." *Goldsmith v. Swan Reefer A.S.*, 173 Fed. Appx. 983, 988 (3d Cir. 2006); *see also Sheeran*, U.S. Dist. LEXIS 44208, at *15. "A duty of care exists when injury is foreseeable or when contractual or other relations of the parties impose it." *Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 203 n.6 (D. Me. 2012) (citing Schoenbaum, Admiralty & Maritime Law § 5-2). "Foreseeability is a legal requirement before recovery can be had [and] . . . in the context of duty, the concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury." *Citizens Bank of Pa. v. Reimbursement Techs.*, 609 F. App'x 88, 92 (3d Cir. 2015) (quoting *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1369 (3d Cir. 1993)). "A defendant breaches his [or her] duty to a plaintiff where the defendant 'fails to protect other people against an unreasonable risk of harm.'" *Great Am. Ins. Co.*, 847 F. Supp. 2d at n.6 (citing Schoenbaum, Admiralty & Maritime Law § 5-2).

All Defendants have denied any involvement with the February fire that destroyed the Fiddler. The record contains no evidence of what caused the fire, and the parties have not presented any expert testimony as to causation. The record also does not contain any evidence as to who lit the fire. The only Defendant that has admitted to being present at the time of the February fire is Andrew. The issue is whether being "present" is sufficient to meet the standard that he lit the fire by a preponderance of the evidence.

Plaintiff argues that Andrew's inconsistent statements give rise to a question of fact that a jury must decide. For example, Andrew allegedly made several statements regarding his involvement with the February fire, including: (1) that he was present when his friend set the boat on fire, (Facebook Chat, ECF No. 33-3, at Ex. F); (2) that he knew who started the fire, that it was

someone from his school, and there was a "gas leak and he [lit] it on fire and booked it" (*See* Hirsch dep., ECF No 33-3, at Ex. B, T48:6-18; Facebook Chat ECF No. 33-3, Ex. E); and (3) he burned the boat down, (*See* Cooper Dep., T25:16-24; T26:15-17). The Court agrees that a jury must decide the credibility of Andrew's statements. For that reason, summary judgment is denied against Andrew for Count I, Negligent Damage to Vessel.

Regarding the other teenagers, Reed and Alec, there is little or no evidence in the record that places them at the boat when it was set on fire in February, or that shows they were actually involved at all in the burning of the boat. At the time of the fire, Andrew provided two versions of the events: that his friend from Marlboro started the fire, and that his friend from Red Bank High School started the fire. (*See* Facebook Chat, ECF No. 33-3, at Ex. F; Hirsch dep., ECF No 33-3, at Ex. B, T48:6-18; Facebook Chat ECF No. 33-3, Ex. E). At his deposition, Andrew identified his friend from Marlboro as Alec, but admitted he lied when blaming Alec for the fire. Additionally, he has never identified who the friend from school was that allegedly started the fire.

Instead, Plaintiff argues that Alec and Reed are liable on a far different theory. That is, Plaintiff argues that Reed and Alec are liable not for their participation in the February fire, but because it was foreseeable that they knew or should have known that Andrew would burn the Fiddler. Plaintiff's theory is convoluted, but he strings some facts together; that is, Alec and Reed knew Andrew was the individual who set the Vessel on fire in February (*Id.*), and they knew that Andrew had a propensity to set things on fire. (*Id.*) Moreover, Andrew had a motive to set the boat on fire as he was jealous of Reed's romantic relationship with Samantha, and in order to impress Samantha, Andrew would light the fire to "take down" Reed. (*Id.* at 35). Because of these facts, Plaintiff contends that Alec and Reed had a duty to advise a responsible adult that they had boarded the Fiddler in January, and that at that time, Andrew stole flares and a flare gun; and if

those actions were reported, Andrew would have been thwarted from igniting the boat. In sum, Plaintiff alleges that the past conduct of Andrew was sufficiently foreseeable for Alec and Reed to know that Andrew would burn the Fiddler, giving rise to a legal duty to act. This is speculative. *See Podias v. Mairs*, 394 N.J. Super. 338 (App. Div. 2007).

In *Podias*, the New Jersey Appellate Division considered whether a passenger in a car owed a duty to a motorcyclist struck by the driver when the driver refused to or was unwilling to provide emergency aid to the motorcyclist. *Podias*, 394 N.J. Super. at 343. The court, in imposing a duty, explained that the motorcyclist's risk of injury, death, was clearly and readily foreseeable, and explained that it is "based on the defendant's knowledge of the risk of injury . . . A corresponding consideration is the practicality of preventing it." *Id.* at 350. Thus, "when the defendant's actions are 'relatively easily corrected' and the harm sought to be presented is 'serious,' it is fair to impose a duty." *Id.* (quoting *J.S. v. R.T.H.*, 155 N.J. 330, 339-40 (N.J. 1998)).

Plaintiff argues that, like the defendants in *Podias*, the Defendants here knew Andrew liked to set things on fire, and they also knew that Andrew was aware that the Fiddler was seemingly abandoned in the Navesink. Because of this, Alec and Reed should have been aware that Andrew would set fire to the Fiddler. If the teenagers had reported their actions during the January theft to police, or to responsible adults, Plaintiff argues that the harm to the Fiddler during the February fire would have been avoided. (Pl. br. at 34).

Here, there is insufficient evidence placing Defendants on notice that Andrew had a proclivity to start fires. Andrew's past conduct, and the January theft, do not result in any clearly and readily foreseeable knowledge that Andrew is an arsonist that would set the Vessel on fire in February. Apart from the speculative statements that Andrew liked fire, there is no other support in the record showing same. For example, there is no evidence that Andrew had previously been

charged with arson. Further, there is no evidence that Andrew ever purposefully started a fire. Accordingly, it was not foreseeable that after boarding the Fiddler in January and taking the flares and flare gun, Andrew would allegedly set fire to the Fiddler nearly two weeks later in February.

In summary, even after taking all inferences and credibility determinations in favor of Plaintiff, a reasonable jury could not find for him, because the February fire and destruction of the Fiddler was not clearly and readily foreseeable after the January theft, especially since the theft occurred two weeks before the February fire. Because foreseeability is a necessary prerequisite, summary judgment on Counts V and IX are granted to Defendants Alec and Reed.[5]

2. Civil Conspiracy (Counts II, VI, and X)

Plaintiff broadly alleges that Defendants conspired to trespass, vandalize, burn, and sink the Fiddler and for that, they are vicariously liable for any damage to the Vessel. In New Jersey, there are four elements to the tort of civil conspiracy: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 390 n.19 (D.N.J. 2016) (citing *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d

---

[5] Counts III, VII, and XI bring claims for Invasion against Andrew, Alec, and Reed, alleging that "[a]s a direct and proximate result of the performance of acts of invasion . . . [Plaintiff] (i) lost the Fiddler; (ii) engaged in great labors and paid sums of money to ensure the hulk of the Fiddler was not a hazard to navigation, and; (iii) was caused to pay substantial fines to the authorities to ensure that hazards to navigation and possible damage to the environment were abated." (AC at ¶¶ 31, 55, 83). The Court finds no cause of action for invasion. Further, as stated above, the record does not support that the defendant minors' trespass of the Fiddler on January 31, 2014, and its subsequent fire on February 12, 2014, are related. Nothing in the record supports that Defendants Reed or Alec participated in the fire. Plaintiff's claims against Defendant Andrew are permitted to go forward based on Andrew's statements that he was present when the Fiddler was burned. Accordingly, summary judgment for Counts III, VII, and XI are granted.

Cir. 2003)).

As stated above, there is no credible evidence in the record that Defendants Reed or Alec were present when the Fiddler was burned in February. Instead, Plaintiff argues that a civil conspiracy existed because the teenagers conspired to "conceal the spoils" of their theft, two weeks before the February fire. However, this alone is not enough to support that the minor Defendants conspired to burn down the Fiddler. There is no evidence of any agreement to burn the Vessel between any of the Defendants. The only evidence presented that would support a civil conspiracy are the statements made by Andrew, where he claimed he was present when the Fiddler was burned, or knew who burned the Fiddler. However, this evidence fails to show that any agreement, necessary for civil conspiracy, existed. Accordingly, summary judgment is proper for Counts II, VI, and X.

3. Parental Liability (Counts IV and XII)

Under New Jersey law:

> A parent, guardian or other person having legal custody of an infant under 18 years of age who fails or neglects to exercise reasonable supervision and control of the conduct of such infant, shall be liable in a civil action for any willful, malicious or unlawful injury or destruction by such infant of the real or personal property of another.

N.J. Stat. Ann. § 2A:53A-15. The New Jersey Supreme Court has explained that parents are liable under that statute for "the negligent supervision of children who willfully or maliciously destroy the property of another." *Prop. Cas. Co. of MCA v. Conway*, 147 N.J. 322, 330, 687 (1997).

Here, having granted summary judgment for the claims against minor-defendant Alec for negligent destruction of the Fiddler, summary judgment is proper for the claims against his parent/legal guardian for negligent supervision as well, as there is no evidence in the record that would support Alec willfully or maliciously caused any damage to the Fiddler. Accordingly,

11

summary judgment for Count XII, Hirsch Parental Tort, is granted.

In contrast, because the negligent damage to the Vessel claim remains against Andrew, summary judgment is not proper for the negligent supervision claims against his parent/guardians as well, if a Jury were to find that Andrew lit the boat afire, and acted willfully or maliciously in doing so. Accordingly, summary judgment is denied for Count III, Hollander Parental Tort.[6]

---

[6] Jerzy and Michelle Chojnacki were dismissed from this action on December 12, 2018. (ECF No. 43). Additionally, because Defendant Samantha Cooper was dismissed from this action on January 10, 2019, the claims (Count XV) against her parents or legal guardians are dismissed as well. (ECF No. 50).

summary judgment for Count XII, Hirsch Parental Tort, is granted.

In contrast, because the negligent damage to the Vessel claim remains against Andrew, summary judgment is not proper for the negligent supervision claims against his parent/guardians as well, if a Jury were to find that Andrew lit the boat afire, and acted willfully or maliciously in doing so. Accordingly, summary judgment is denied for Count III, Hollander Parental Tort.[6]

2/15/19

_____
PETER G. SHERIDAN, U.S.D.J.

---

[6] Jerzy and Michelle Chojnacki were dismissed from this action on December 12, 2018. (ECF No. 43). Additionally, because Defendant Samantha Cooper was dismissed from this action on January 10, 2019, the claims (Count XV) against her parents or legal guardians are dismissed as well. (ECF No. 50).